[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-14849

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 2, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-00229-CV-2


DOUGLAS ASPHALT CO.,
JOEL H. SPIVEY,
KYLE SPIVEY,

Plaintiffs-Appellees,

versus

QORE, INC.,
APPLIED TECHNICAL SERVICES, INC.,

Defendants,


GEORGENE M. GEARY,
GLENN DURRENCE,
GUOHUA LIAN,
a.k.a. George Lian,
PAUL V. MULLINS,
GREG MAYO,
LARRY MATTHEWS,
HAROLD LINNENKOHL,
RICK DOUDS,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

**(September 2, 2008)**

Before WILSON, PRYOR and MIDDLEBROOKS,[*] Circuit Judges.

WILSON, Circuit Judge:

Appellants Georgene M. Geary, Glen Durrence, Guohua "George" Lian, Paul V. Mullins, Grey Mayo, Larry Matthews, Harold Linnenkohl, and Rick Douds, (collectively, "GDOT officials") are government officials for the Georgia Department of Transportation ("GDOT"). The GDOT officials appeal the district court's denial in part of their motion for judgment on the pleadings, finding that the officials were not shielded from liability by their defense of qualified immunity with respect to Appellees' "class of one" equal protection claim. Appellees Douglas Asphalt Company, a highway paving contractor, and its owners and principals, Joel H. Spivey and Kyle Spivey (collectively, "Douglas") alleged that the GDOT wrongly singled Douglas out and treated it differently than all other paving contractors in violation of the equal protection clause. Because a

_____

[*] Honorable Donald M. Middlebrooks, United States District Judge for the Southern District of Florida, sitting by designation.

"class of one" claim is not legally cognizable under the circumstances of this case, and because Douglas failed to adequately allege a similarly situated comparator, the district court erred in allowing the claim to survive the motion for judgment on the pleadings. In so holding, we rely heavily on the Supreme Court's decision in *Engquist v. Oregon Department of Agriculture*, ___ U.S. ___, 128 S. Ct. 2146, ___ L. Ed. 2d. ___, (2008), an opinion that, due to its recent publication, was not available to the district court for consideration. Accordingly, we reverse and remand.

## I. BACKGROUND

In 1996 and 2000, the GDOT awarded two construction contracts to Douglas. The 1996 contract (the "I-95 project") required Douglas to mill and resurface approximately eleven miles of Interstate 95 in MacIntosh and Glynn Counties, Georgia. The 2000 contract (the "I-75 project") required Douglas to pave parts of Interstate 75, conduct bridge rehabilitation, and widen roads in Turner and Crisp Counties, Georgia. The GDOT required that both projects were to be performed using a specified amount of hydrated lime in the asphalt mix. Hydrated lime is used to reduce the susceptibility of the asphalt to moisture damage and, if not used in the proper amounts, may result in potholes, stripping or other problems. Douglas's performance on the I-95 project spanned from 1996-

1997 and, in 2000, the GDOT issued its acceptance of the work. Douglas's performance on the I-75 project encountered unanticipated delays that culminated in the GDOT assessing Douglas with $842,100 in liquidated damages.

In 2003, GDOT began noticing surface problems on both portions of I-95 and I-75 that were repaved by Douglas. The GDOT utilized a number of testing procedures to determine the lime content in the asphalt. Because the test results showed an insufficiency of lime, the GDOT requested that Douglas replace the defective asphalt. Douglas refused, contending that the testing procedures were unreliable and inaccurate. On January 26, 2004, the GDOT declared Douglas in default on the I-95 project for failing to remove and replace seven lots of asphalt on I-95.

On April 16, 2004, the GDOT requested bids to repave the defective portions of I-95 (the "I-95 repave project"). Although Douglas was the lowest bidder, all bids were rejected at that time. On July 2, 2004, the GDOT sent a letter to Douglas stating that tests performed on the I-75 project, which were the same tests utilized on the I-95 project, showed insufficient lime content. As it had done with the I-95 project, the GDOT requested that Douglas remedy the deficiencies. Douglas ultimately refused, again contending that the tests were faulty and inaccurate.

4

On July 16, 2004, the GDOT initiated a re-bid of the I-95 repaving project. The re-bid proposal contained a special provision, designed to expedite the process, stipulating that the new contract must be accepted by the successful bidder by 1:00 p.m. on July 27, 2004, and that such bidder must sign the contract and execute the proper bonds no later than 9:00 a.m. on July 30, 2004. Failure to comply with the stipulations equated to a rejection of the bid. Douglas was again the lowest bidder and was initially awarded the contract. The GDOT did not notify Douglas of its successful bid. The four-day acceptance period lapsed on July 30, resulting in cancellation of the contract. Later that same day, the contract was awarded to the second lowest bidder, Seaboard Construction Company, a/k/a Plant Improvement Company ("Plant Improvement"). Also on that same day, a GDOT representative notified Plant Improvement that it was the successful bidder.

Approximately two months later, on October 4, 2004, the GDOT declared Douglas in default on the I-75 project for failure to remove and replace the defective lots of asphalt. On August 10, 2006, the GDOT removed Douglas from the list of potential bidders for GDOT projects.

In 2004 and 2005, Douglas sued the GDOT in the Superior Courts of Fulton and Turner Counties, Georgia, for breaches of contract. On October 10, 2006, Douglas filed the instant action asserting, inter alia, an equal protection claim

under 42 U.S.C. § 1983. Douglas alleged that the GDOT officials knowingly utilized false and inaccurate tests on the I-95 and I-75 projects, and that the tests had never "been used for this purpose in the known universe." Douglas further alleged that it was singled out for disparate treatment by the GDOT's failure to provide Douglas with notice of its successful bid.

On October 1, 2007, upon the GDOT officials' motion for judgment on the pleadings, the district court held that Douglas's equal protection claim survived the officials' defense of qualified immunity. The GDOT officials timely filed their notice of appeal on October 1, 2007.

## II. STANDARD OF REVIEW

We review the denial of a motion for judgment on the pleadings *de novo*. *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). Judgment on the pleadings is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *Id.* All facts alleged in the complaint must be accepted as true and viewed in the light most favorable to the nonmoving party. *Id.*

Likewise, our review is de novo "[o]n an interlocutory appeal from the denial of qualified immunity." *Kjellsen v. Mills*, 517 F.3d 1232, 1236 (11th Cir. 2008).

## III. DISCUSSION

Qualified immunity protects law enforcement officials from § 1983 suits for civil damages arising from the discharge of their discretionary functions "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987). It is well established that a plaintiff seeking to overcome the defendant's privilege of qualified immunity must show (1) that the officer violated her federal constitutional or statutory rights, and (2) that those rights were clearly established at the time the officer acted. *See Wilson v. Layne*, 526 U.S. 603, 609, 119 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999). We first turn to whether Douglas has asserted the violation of a constitutional right.

The "class of one" theory taken up by Douglas was first expressly recognized by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) (per curiam). In *Olech*, the Village of Willowbrook conditioned the connection of the plaintiffs' property to the municipal water supply upon the grant of a 33-foot easement, while the Village required only a 15-foot easement from other similarly situated property owners. *Id*. at 563, 120 S. Ct. at 1074. *Olech* held that the plaintiffs successfully stated a class-of-one claim by alleging that they were intentionally treated differently from

7

others similarly situated and there was no rational basis for the difference in treatment. *Id*. at 565, 120 S. Ct. at 1075. Douglas, relying on *Olech*, asserts that the GDOT intentionally treated it differently without a rational basis by: (1) authorizing invalid testing procedures that were not performed on others; and (2) failing to notify Douglas of its winning bid on the I-95 re-pave project when Plant Improvment, the second-lowest bidder, was so notified.

The Supreme Court recently revisited the class-of-one theory in *Engquist v. Oregon Department of Agriculture*, ___ U.S. ___, 128 S. Ct. 2146, ___ L. Ed. 2d. ___, (2008), where a state employee alleged that she had been effectively laid off for "arbitrary, vindictive, and malicious reasons." *Id*. at ___, 128 S. Ct. at 2149. The Court began by setting forth the "long held view that there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage its internal operation.'" *Id.* at ___, 128 S. Ct. at 2151 (alteration omitted) (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 896, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961)). The Court explained that "'[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.'" *Id*. (quoting *Waters v. Churchill*,

8

511 U.S. 661, 675, 114 S. Ct. 1878, 1888, 128 L. Ed. 2d 686 (1994) (plurality opinion). The government, therefore, "has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large." *Id.*

The Court further explained that employment decisionmaking is an enterprise that is "often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Id.* at ___, 128 S. Ct. at 2154. This is in contrast to the regulation in *Olech*, where "the existence of a clear standard against which departures, even for a single plaintiff, c[an] be readily assessed." *Id.* at ___, 128 S. Ct. at 2153. To treat like employees differently is not to violate the equal protection clause; rather, it is an accepted consequence of "the broad discretion that typically characterizes the employer-employee relationship." *Id.* at ___, 128 S. Ct. at 2155. As a result, the Court held that "the class-of-one theory of equal protection has no application in the public employment context." *Id.* at ___, 128 S. Ct. at 2156. In arriving at this conclusion, the Court was guided "by the 'common-sense realization that government offices could not function if every employment decision became a constitutional matter.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 143, 103 S. Ct. 1684, 1688, 75 L. Ed. 2d 708 (1983)).

We have little trouble applying the reasoning in *Engquist*, directed at a the government-employee relationship, to the circumstances in this case involving a government-contractor relationship. In *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 116 S. Ct. 2342, 135 L. Ed. 2d 843 (1996), the Court addressed whether independent contractors may bring a § 1983 retaliation claim when a government entity has acted against the contractor's exercise of free speech. *Id*. at 671-73, 116 S. Ct. at 2345-46. Having never addressed the issue in the independent contractor context, the Court applied its government employment precedents to the question. *Id*. at 673-74, 116 S. Ct. at 2346-47. It did so because of the "obvious" similarities between government employees and government contractors with respect to the issue. *Id*. at 674, 116 S. Ct. 2347. Specifically, the Court explained that "[t]he government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption." *Id*. at 674, 116 S. Ct. at 2347. The Court further articulated that "absent contractual, statutory, or constitutional restriction, the government is entitled to terminate [employees and contractors] for no reason at all." *Id*.

Just as in the employee context, and in the absence of a restricting contract

or statute, decisions involving government contractors require broad discretion that may rest "on a wide array of factors that are difficult to articulate and quantify." *Engquist*, ___ U.S. at ___, 128 S. Ct. at 2154. We hold, therefore, that *Engquist* controls this case and makes clear that Douglas failed to assert a cognizable right to equal protection. Having found no constitutional violation, we do not reach the clearly established prong of the qualified immunity analysis.

We also agree with the alternative argument of the GDOT officials that Douglas failed to adequately allege the similarly situated component of its class-of-one claim. "[T]his circuit, along with others, has tightened the application of Rule 8 with respect to § 1983 cases in an effort to weed out nonmeritorious claims, requiring that a § 1983 plaintiff allege with some specificity the facts which make out its claim." *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1367 (11th Cir. 1998). When a § 1983 claim is challenged on qualified immunity grounds, "we are guided both by the regular 12(b)(6) standard and by the heightened pleading requirement." *Id.* More particularly, with respect to a class-of-one claim, "we are obliged to apply the 'similarly situated' requirement with rigor." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007). In the complaint, Douglas alleged that the GDOT officers' use of the testing procedures was unprecedented. This is insufficient. Douglas must do more than assert that

other, unidentified contractors were given better treatment. *See GJR Invs., Inc.*, 132 F.3d at 1367-68 ("Bare allegations that 'other' applicants, even 'all other' applicants, were treated differently do not state an equal protection claim; a complaint must attempt to show in some fashion that these 'other' applicants were situated similarly to the plaintiff."). Douglas must identify an instance in which a similarly situated contractor completed its project without being subject to the same testing procedures. *See id.* at 1367 (dismissing the class-of-one claim where the complaint failed to "present a single instance" in which the comparator was similarly situated to the plaintiff). Because Douglas did not sufficiently particularize a similarly situated comparator, it fails to state a class-of-one claim.

With respect to the allegation that the GDOT failed to provide Douglas with notice of its successful bid on the I-95 repaving project, the complaint again fails to allege a similarly situated comparator. Although Douglas, in this instance, named a specific comparator (Plant Improvement), the complaint fails to allege that Plant Improvement was similarly situated "in light of all the factors that would have been objectively reasonable" to the GDOT officials. *Griffin Indus. Inc.*, 496 F.3d at 1207 (holding that plaintiff failed to allege the comparator was similarly situated "in light of all the factors that would be relevant to an objectively reasonable governmental decisionmaker"). As indicated by the district court

12

below, Georgia law does not require the GDOT to award the construction contract to the lowest bidder. Rather, the applicable law provides the GDOT with discretion to award the contract to the "lowest *reliable* bidder." Ga. Code Ann. § 32-2-69(a) (emphasis added). The complaint clearly sets forth that the GDOT viewed Douglas as having performed poorly on both the I-95 and I-75 projects, and was declared to be in default on the I-95 project.[1] There is no indication in the complaint that Plant had a similar history of poor performance with the GDOT. It comes as no surprise that Douglas would be treated differently given that the GDOT was soliciting bids for the repaving of the very asphalt that Douglas had, in the GDOT's eyes, improperly laid. Given the prior history between the GDOT and Douglas, we cannot hold that Douglas sufficiently alleged Plant Improvement as similarly situated with respect to the selection of bids on the I-95 repaving project.

## IV. CONCLUSION

Because we hold that Douglas failed to establish a legally cognizable "class of one" claim, and because, alternatively, Douglas failed to adequately allege a similarly situated comparator, we reverse and remand for further proceedings

---

[1] The GDOT declared Douglas to be in default on the I-75 project on October 4, 2004, approximately two months after the bidding on the I-95 repaving project had concluded.

13

consistent with this opinion.

**REVERSED AND REMANDED.**