**Joyce CHRISTIE, on behalf of the ESTATE OF Nicholas T. CHRISTIE, deceased, Plaintiff,**

**v.**

**Mike SCOTT, Lee County Sheriff; Prison Health Services, Inc., n/k/a PHS Correctional Healthcare; Deputy Daniel Falzone; Deputy Kurtis Calhoun; Deputy Dathan S. Pyle; Sergeant Armando Croker; Sergeant Mary DaRoss; Maria Canete, R.N.;**

Linda Sundo, L.P.N.; Natalia Saunders, R.N.; Joan Winnie, R.N.; Janice Stepnoski, L.C.S.W.; Karen Overbee; Christine Aten; Sergeant Robert Bramblet; and Tammy Hamilton, R.N.; Defendants.

Case No. 2:10–cv–420.

United States District Court, M.D. Florida, Fort Myers Division.

Jan. 9, 2013.

Nicholas A. Dicello, William Hawal, Spangenberg Shibley & Liber LLP, Cleveland, OH, Troy Alan Rafferty, Virginia Marie Buchanan, Levin, Papantonio, Thomas, Mitchell, Echsner & Proctor, PA, Pensacola, FL, Theodore Lawton Tripp, Jr., Hahn, Loeser & Parks, LLP, Ft. Myers, FL, for Plaintiff.

Summer M. Barranco, Richard A. Giuffreda, Purdy, Jolly, Giuffreda & Barranco, PA, Ft. Lauderdale, FL, Gregg A. Toomey, Bunnell & Woulfe, PA, Ft. Myers, FL, for Defendants.

## MEMORANDUM AND ORDER

PAUL A. MAGNUSON, District Judge.

This matter is before the Court on three Motions for Summary Judgment. For the

reasons that follow, the Motions are granted in part and denied in part.

## BACKGROUND

In March 2009, Nick Christie drove from his home in Ohio to visit his brother in the Ft. Myers area. During his trip to Florida, he called his wife and she became concerned about his mental health. After he arrived in Florida, his wife contacted the Lee County Sheriff's Office and asked them to check on Christie, because she was worried about his mental condition. Sheriff's deputies ultimately arrested Christie for public intoxication, and he was held overnight at the Lee County Jail. When he was booked into the jail, Christie told staff that he had several serious health problems, including asthma, chronic obstructive pulmonary disorder (COPD), and diabetes. He informed jail staff of the medications he was taking and gave them the name of his physician and his pharmacy. There is some dispute about how complete the information Christie gave the Jail was, but there is no dispute that he gave them some information from which an investigation might have gleaned Christie's complete health history. (*See* Saunders Dep. (Docket No. 202) at 70–78 (discussing contents of Christie's intake file from March 25, 2009, which included medications and the name of a pharmacy, in addition to an authorization Christie signed that would allow PHS to access Christie's medical history).) No one at the jail ever checked these sources for more information about Christie's health.

Although the state judge who held the arraignment asked for a mental health evaluation on Christie, no evaluation was done. Rather, Christie was released on March 26.

On the afternoon of March 27, Christie was once again arrested. He was at an Arby's attempting to give money to passers-by. During booking, he refused to answer questions about his medical condition or medications. No medical intake was done when he was first brought to the Jail, as PHS policy requires. Rather, the medical technician attempted to conduct an intake screening with Christie just after 2:00 am on March 28, twelve hours after his arrest. Christie refused to provide any medical information to the intake clerk at that time.

Christie was initially housed in a closed cell unit but on March 28 was moved to a more open unit of the Jail, Unit 3A, where detainees with mental health concerns were placed to allow for closer observation. (*See* Saunders Dep. (Docket No. 202) at 38 (Q: "And mental health patients, including those who may be off their meds, would be housed on 3A at the downtown jail, correct?" A: "In 2009, yes.").) He was apparently very loud and belligerent and was also confused—he repeatedly asked for his car keys so he could go home. There is little evidence, however, that he was physically violent with staff.[1]

Despite this, Christie was sprayed more than 12 times with pepper spray, or oleoresin capsicum (OC), during his brief stay at the jail. He was also restrained in a restraint chair for more than five hours, was sprayed with OC while restrained, was not decontaminated after the pepper spraying, and was at times forced to wear a "spit mask" over his nose and mouth, including when he was strapped naked in a restraint chair and after being sprayed with pepper spray. He was not given any of his prescribed medication during this time, either. On March 29, Christie's health deteriorat-

---

1. The only evidence that Christie was ever physically violent is the testimony of a deputy that Christie grabbed his wrist through the food pass in the closed-cell unit a few hours after he was arrested. (Calhoun Aff. (Docket No. 167–4) at 5.)

ed and he was transported to the hospital. He died on March 31 at the age of 62. The coroner determined that the cause of death was homicide due to OC poisoning. Indeed, the emergency room physician who examined Christie at the hospital testified that Christie was "entirely covered" in pepper spray, and that the physician had to decontaminate himself during his treatment of Christie because of the amount of pepper spray. (Guffrey Dep. (Docket No. 194) at 8.)

Christie's widow brought this lawsuit, alleging violations of § 1983 for excessive force and deliberate indifference to Christie's serious medical and mental-health needs, and a variety of state-law torts. Her claims are brought against the three moving parties here: Prison Health Services, which was the contract provider for medical and mental-health services at the Jail, and PHS's medical-staff employees; Sheriff Mike Scott; and employees of the Sheriff who work in the Jail. Plaintiff recently amended her Complaint to assert punitive damages, and the operative Complaint is the Fifth Amended Complaint (Docket No. 248).

## DISCUSSION

Summary judgment is proper only if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir.1999).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to

judgment as a matter of law. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir.2001). When opposing a motion for summary judgment, the nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A. PHS[2]

Plaintiff brings claims against PHS and eight of PHS's employees at the Jail: Maria Canete, Linda Sundo, Natalia Saunders, Joan Winnie, Janice Stepnoski, Karen Overbee, Christine Aten, and Tammy Hamilton. Stepnoski is a social worker, and Aten was a medical technician, but the remaining PHS Defendants are licensed nurses, either RNs or LPNs. Plaintiff's claims against the PHS Defendants are: § 1983 deliberate indifference (count 2); § 1983 failure to train (count 3); § 1983 unconstitutional custom, policy, or practice (counts 4 and 5); medical negligence (count 7); and negligent hiring, retention, or supervision (count 11). PHS concedes that there are questions of fact on the negligence claims (medical negligence and negligent hiring, retention, or supervision), and thus the Court will not discuss those claims further.

Although PHS is not a municipal entity, " '[w]here a function which is traditionally the exclusive prerogative of the state (or here, the county) is performed by

---

**2.** PHS is now known as Corizon Health, Inc., but has not sought to change the name on the docket, and thus the Court will refer to the entity as PHS.

a private entity,' that private entity, like a municipality, may be held liable under § 1983." *Fields v. Prison Health Servs., Inc.*, 2:09cv529, 2011 WL 3878373, at *7 (M.D.Fla. Sept. 2, 2011) (Steele, J.) (quoting *Ancata v. Prison Health Servs.*, 769 F.2d 700, 703 (11th Cir.1985)).

Each individual PHS Defendant had different contacts with Christie during his time at the Jail. Defendants Joan Winnie and Linda Sundo were on duty on March 29, the day Christie was sprayed multiple times, placed in a restraint chair and sprayed while restrained, and then finally taken to the hospital. They each evaluated Christie after one or more applications of pepper spray. Their supervisor that day, and apparently the person who made the decision to send Christie to the hospital, is Defendant Maria Canete, who was the charge nurse on duty. Canete also called Defendant Janice Stepnoski, the Jail's social worker, to request a mental-health screening for Christie, but that call was not made until 6 pm on Saturday evening, and by the time Stepnoski came into the Jail on Sunday, Christie was in the throes of a medical emergency. (Stepnoski Dep. (Docket No. 205) at 62.) Christie was never screened for mental-health issues.

Defendant Christine Aten was the intake clerk who was unable to get any medical information from Christie after his second arrest. Defendant Karen Overbee is an assistant director of nursing at the Jail; as such, she was Canete's direct supervisor, but she had no direct contact with Christie during his time at the Jail. Overbee's involvement in the case appears to be that she allegedly told Aten, the intake clerk, that the medical intake screening information from Christie's first Jail stay was not accessible, even though that information was indeed accessible and should have been included in the second intake screening.

Defendant Natalia Saunders was also an assistant director of nursing at the time of Christie's stay at the Jail. She was covering another nurse's shift on the afternoon of March 27, when Christie was detained for the second time, and she was called to perform a medical evaluation of Christie after he was sprayed with pepper spray that afternoon. Saunders also attempted to locate the records from Christie's previous detention, but was unable to do so. She requested Christie's file from medical records but the file was never located or sent to the Jail. Finally, Defendant Tammy Hamilton was the charge nurse on the overnight shift at the Jail from March 27 to 28, 2009, when Christie refused to be medically screened. She signed the screening form as a second reviewer, but did not take any further action to seek additional information from Christie. Hamilton was only employed by PHS for three months; she was terminated in May 2010 for, among other things, failing to review detainees' medical records and provide medications. (Hamilton Dep. (Docket No. 195) at 37.)

### 1. Deliberate Indifference

[2, 3] To establish that the PHS individual Defendants denied Christie medical care, Plaintiff "must show an objectively serious medical need and show that 'the prison official's response to that need was poor enough to constitute an unnecessary and wanton infliction of pain." *Fields*, 490 Fed.Appx. at 182 (quoting *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011)). PHS itself can be liable for deliberate indifference only if its custom or policy caused the constitutional injury. *Id.* "A policy may be deliberately indifferent if it is facially unconstitutional or where the policy is implemented 'with deliberate indifference as to its known or obvious consequences.'" *Id.* at 182 (quoting *McDowell v. Brown*, 392 F.3d 1283, 1291 (11th Cir.

2004)). Thus, Plaintiff's deliberate-indifference claim and her claim for unconstitutional custom, policy, or practice against PHS are really one and the same and will be discussed as such below.

### a. *Individual PHS defendants*

Plaintiff contends that the PHS nurses were deliberately indifferent to Christie's serious medical needs by both failing to conduct a mental health assessment when he was jailed for the second time, and by failing to properly medically evaluate Christie after the multiple pepper-spray exposures.

### (i) **Mental health assessment**

■ In 2009, PHS staff at the Jail were repeatedly failing to follow PHS's protocols with respect to screening new inmates. (*See, e.g.,* Saunders Dep. (Docket No. 202) at 85 (discussing supervisor's review that staff was repeatedly failing to follow intake protocols).) There was not a protocol, however, with respect to mental health screening, and thus Plaintiff's claim in this regard is unclear. The deficiencies that are noted in the depositions are almost all medical—the second intake did not ascertain Christie's medications or his physical conditions—and there is very little testimony with respect to mental health screening. There is not enough evidence in the record to say that any individual Defendant's failure to conduct a more thorough mental health screening of Christie was "poor enough to constitute an unnecessary and wanton infliction of pain." Although Plaintiff might be able to establish deliberate indifference based on the clearly inadequate medical intake screening, she is not claiming this. As against these individual Defendants, a claim that their failure to perform a mental health screening amounted to deliberate indifference is not borne out by this record. This aspect of Plaintiff's claims is therefore dismissed.

### (ii) **Medical evaluation after chemical exposure**

PHS's written policy requires its nurses to conduct a hands'-on evaluation of a detainee who has been sprayed with pepper spray, including monitoring of blood pressure, pulse, and respirations. (Irving Dep. (Docket No. 196) at 52, 54.) A nurse evaluation was expected within 15 minutes of the exposure to chemicals, and was documented on a written form. (*Id.* at 54.) The nurse evaluation, known colloquially as "clearing," was not an involved process and typically only took 5 minutes of a nurse's time. (*Id.*)

Rather than perform the required medical evaluation after each time Christie was pepper-sprayed, the PHS nurses would merely visually inspect him from outside the cell. According to Plaintiff, PHS nurses routinely ignored the medical clearance requirement, such that the policy became one of only visually inspecting a detainee who had been sprayed with pepper spray, despite the requirement of an actual physical examination. (Pl.'s Opp'n Mem. (Docket No. 210) at 7.) She does not cite the record in support of this assertion, however.

PHS policy also requires that a detainee in restraints must be monitored every 15 minutes for circulation, respiratory status, and mental status, and his vital signs taken every 30 minutes. (Pl.'s Opp'n Mem. Ex. 7 (Docket No. 210–7) at 2.) Restrained detainees are to be allowed to use a bedpan or urinal and are to be offered fluids every 2 hours. (*Id.*)

There is no dispute that no medical clear forms exist for any of the times Christie was sprayed with OC, or that he was not appropriately medically monitored while restrained. Indeed, the evidence shows that he was restrained naked for 5 hours and was not given anything to eat or drink, nor was he allowed to use the toilet at all

during that time, forcing him to soil himself. The two nurses on duty at the time, Sundo and Winnie, were reprimanded for failing to ensure that Christie was given food, water, or allowed to use the toilet. (Sundo Dep. (Docket No. 206) at 53–54.) While they did monitor him, their visits were hourly, not every 15 minutes as the policy required. Defendants' response to Plaintiff's argument in this regard is that Christie was monitored when he was in the restraint chair, because his vital signs were taken at 9:47 am and 1:47 pm. (Defs.' Reply Mem. (Docket No. 224) at 3.) The policy requires vital signs every 30 minutes, not every four hours, and Defendants' argument is not well taken.

 "When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989). There is no question that the nurses on duty Sunday morning, who failed to clear Christie after each pepper-spray application and failed to medically monitor him as PHS policy required after he was restrained, provided such cursory care as to amount to no treatment at all. Thus, Defendants Sundo, Winnie, and Canete may be liable for deliberate indifference. Whether the other PHS Defendants similarly provided constitutionally insufficient care, however, is a much closer question. With respect to those individuals who had no contact with Christie—Stepnoski and Overbee—Plaintiff has not brought forth facts in the record from which a jury could find individual liability. Similarly, Hamilton's contact with Christie was not constitutionally deficient. Although in a perfect world Hamilton would have sought more information from Christie or attempted to find his previous intake screening record, her actions were not more than grossly negligent. *See Thomas v. Bryant*, 614 F.3d 1288, 1312 (11th Cir.2010) (noting one element of deliberate indifference is con-

duct that is more than gross negligence). Aten was merely a clerk; she cannot be liable for the intake she performed, because she was not aware that there was anything else she could do to find the prior intake record. And Saunders's conduct was not negligent at all—she did her best to find Christie's prior intake record, including going to medical records herself to search for it. The undisputed evidence belies Plaintiff's claim that Saunders was deliberately indifferent.

Thus, Plaintiff's deliberate indifference claim survives, but only as to Canete, Sundo, and Winnie. The remaining PHS individual Defendants (Saunders, Stepnoski, Overbee, Hamilton, and Aten) are dismissed from Plaintiff's § 1983 deliberate-indifference claim.

### b. *PHS*

Plaintiff attempts to establish PHS's liability for the § 1983 deliberate indifference in several ways. First, she claims that PHS's alleged policy or practice of understaffing the Jail with mental-health personnel on weekends effectively denied Christie access to adequate mental-health care. (Pl.'s Opp'n Mem. (Docket No. 210) at 23.) She also contends that PHS "ceded medical decision-making power to corrections personnel" by failing to have a policy in place that required medical staff to intervene with corrections officers when officers' actions put patient safety at risk. (*Id.* at 24.) Third, she argues that PHS's employees had a known custom of not following policy on initial intake screening, resulting in Christie not receiving adequate medical care. (*Id.* at 24–25.) She asserts that the failure of the individual Defendants to access Christie's previous intake screening record was a result of an inadequate PHS policy concerning medical records. Fifth, she contends that PHS had a custom of allowing its nurses not to properly document medical condi-

tions, including not filling out the forms PHS ostensibly required after a pepper-spraying or restraint. Her sixth contention is that PHS had a custom of not properly decontaminating detainees after pepper-spraying, despite the policy requiring such decontamination and the filling-out of an appropriate form to document the decontamination. Seventh, she argues that PHS's custom was that nurses were not required to follow policy with respect to evaluating detainees strapped in restraint chairs. Finally, she contends that PHS's lack of policy with respect to the pepper-spraying of mentally ill detainees violated the Constitution.

#### (i) Understaffing

■ Judge John E. Steele of this District held a trial in the fall of 2011 regarding the medical treatment of a detainee at the Lee County Jail. *Fields v. Prison Health Servs., Inc.*, 2:09cv529, 2011 WL 3878373 (M.D.Fla. Sept. 2, 2011). There was some discussion in the trial about PHS allegedly understaffing medical personnel at the Jail, and Plaintiff here argues that the evidence in *Fields* is equally applicable here to establish her claim that PHS's policy was to understaff the Jail and that constitutional violations should have been expected to result. But the main issue in *Fields* was not understaffing, it was the PHS policy that only a physician could send a detainee to the hospital. This policy is simply not at issue here.

The only evidence Plaintiff has of her claim that PHS consistently understaffed the Jail on weekends is a passing remark in one nurse's evaluation that the nurse was always willing to pitch in during "ever-present" staff shortages. (Sundo Dep. Ex. 11 (Docket No. 206–11).) This is not enough to establish that PHS knew or should have known that the number of medical staff on duty was insufficient such that it was likely to cause a constitutional violation.

And the fact that there were no mental-health professionals on duty on the weekends is likewise not per se constitutionally deficient. There were mental-health professionals on call, and Plaintiff cannot show that this staffing decision was likely to lead to a constitutional violation. Plaintiff's claim that PHS's alleged policy of understaffing at the Jail violates § 1983 is not supported by the record and is dismissed.

#### (ii) Intervention with corrections officers

■ This claim is a bit difficult to understand. Plaintiff contends that it is PHS's responsibility to ensure that detainees' medical needs are met, and this is no doubt the truth. But a policy requiring that a nurse intervene with corrections officers whenever the nurse believes a detainee's health may be adversely affected by a corrections officer's actions does not reflect the reality of a jail situation. It may be preferable that medical staff and corrections staff have a good working relationship so that concerns can be exchanged, but a formal policy requiring intervention is likely not appropriate. Moreover, Plaintiff has not established that the lack of such a policy should have put PHS on notice that a constitutional violation was likely to occur. This aspect of her claim against PHS is dismissed.

#### (iii) Intake screening

■ There is no evidence in the record that PHS routinely condoned inadequate medical screening of detainees. The only evidence is that the second screening of Christie was inadequate because no one was able to locate the record of his first intake screening. Although in some cases a plaintiff claiming a custom-or-policy violation need not establish that the custom was a widespread practice of which the entity should have been aware, with re-

spect to this allegation, PHS can only be liable if Plaintiff has some evidence that poor intake screening had been a problem and PHS therefore knew it was a problem. She has no such evidence here. This claim is dismissed.

#### (iv) **Medical records**

█ This aspect of Plaintiff's claim is more akin to a failure-to-train claim than a policy-or-practice claim. As with the intake screening claim, PHS's liability for an allegedly faulty medical records policy requires showing that this policy's faults caused other incidents so that PHS should have known that the policy needed to be changed. Plaintiff has no evidence of any other incident in which a detainee's prior medical records were not obtained, leading to injury. This claim fails.

#### (v) **Documentation of conditions and events**

█ Nor does Plaintiff have evidence of any sort of widespread practice of nurses failing to document detainees' medical conditions. Indeed, Nurse Hamilton was fired for failing to adequately document medical conditions, showing that PHS took action to correct the situation when it became aware of such failings. This claim is likewise dismissed.

#### (vi) **Decontamination**

█ Plaintiff's claims regarding the "clearing" of detainees who had been subjected to OC are different, however. PHS had a policy that required a nurse to physically examine a detainee who had been sprayed with OC, but the nurses routinely ignored this requirement, and PHS knew it. (*See* Canete Dep. (Docket No. 187) at 62 ("I have to honestly say, no one was doing it.").) PHS even acknowledges that the practice in the Jail was that a nurse would merely speak to the detainee after he was sprayed to ensure he was still breathing. This was widespread and well-

known, and thus was a custom for which PHS can be liable. Moreover, the failure of nurses to physically examine inmates after OC sprayings, especially repeated OC sprayings, was likely to lead to exactly what happened here: nurses failing to recognize when a detainee was in severe respiratory distress because of pepper-spray exposure. Plaintiff has established genuine issues of fact as to whether PHS's custom of not following PHS's written policy regarding clearing and decontamination was the moving force behind the constitutional violations here. This portion of the claim against PHS survives.

#### (vii) **Evaluation of restrained detainees**

█ Similarly, the nurses' testimony establishes that medical staff did not follow PHS's written policy regarding medical evaluation of restrained detainees, and that PHS knew or should have known this. Indeed, PHS's own insistence that it was appropriate for the nurses to take Christie's vital signs only twice in five hours (rather than 10 times in five hours, as the policy requires) establishes that PHS knew that the practice of not properly evaluating restrained individuals was widespread. And that such a practice might lead to just what happened here is self-evident. PHS can be liable for its practice of allowing nurses to not follow the written policy regarding medical evaluation of restrained detainees.

#### (viii) **Use of OC on mentally ill detainees**

█ In January 2009, Judge Corrigan of this District issued a lengthy order regarding the pepper-spraying of inmates at a Florida prison. *Thomas v. McNeil,* No. 3:04cv917, 2009 WL 64616 (M.D.Fla. Jan. 9, 2009). Although *Thomas* involved inmates who were designated as mentally ill, it clearly and decisively put Florida corrections officials on notice that the indiscriminate pepper-spraying of inmates was not

appropriate, especially if those inmates were potentially mentally ill. One of the notable things about this decision is that Judge Corrigan catalogs the number of times each plaintiff inmate was pepper-sprayed, and none was ever sprayed more than twice in one day. As noted, Christie was sprayed 12 times in approximately 36 hours. The *Thomas* decision, as well as other precedent, establishes that the force used against Christie "crossed the line separating necessary force from brutality." *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984).

Plaintiff contends that the *Thomas v. McNeil* decision should have put PHS on notice that the pepper-spraying of mentally ill inmates was not appropriate. But PHS employees do not use pepper spray. Only the corrections officers can use pepper spray. Thus, Plaintiff's claim has to be that PHS somehow should have put a stop to any pepper-spraying that the *Thomas* decision said was unconstitutional. This is not PHS's role in the Jail, however, and any failure on the Jail's part to follow the *Thomas* decision is the Jail's responsibility, not PHS's. This aspect of Plaintiff's claim is dismissed.

### 2. Failure to Train

PHS does not discuss Plaintiff's failure-to-train claim, or even mention that claim, in its papers. PHS thus apparently concedes that this claim is not appropriate for summary judgment. This claim therefore survives summary judgment.[3]

### B. Sheriff Scott

■ Plaintiff's claims against Sheriff Mike Scott are brought against him in his official capacity only. (5th Am. Compl. ¶ 20.) Thus, it is as if Plaintiff is bringing suit against the municipal entity, Lee County. *See Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (a suit against government officer in his official capacity is the same as a suit "against [the] entity of which [the] officer is an agent" (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978))). A public entity cannot be held liable under theories of respondeat superior or vicarious liability for violations of § 1983. *Woody v. Cronic*, 401 Fed.Appx. 509, 511–12 (11th Cir.2010). Rather, a public entity may be sued under § 1983 only where the allegedly unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or where the alleged action is "pursuant to governmental 'custom.'" *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018.

Plaintiff brings six claims against Sheriff Scott: failure to supervise, train, or take corrective measures in violation of § 1983 (count 3); unconstitutional custom, policy or practice relating to excessive force (count 4); unconstitutional custom, policy, or practice relating to the denial of medical and mental health services (count 5); assault and battery (count 8); and negligent hiring, retention, and supervision (counts 9 and 10).

### 1. Failure to Train

■ A plaintiff faces an onerous burden in bringing a claim for failure to train

---

**3.** As discussed below with respect to individual Corrections Defendants, however, there is no evidence that any of the individual PHS Defendants named in this count—Canete, Stepnoski, and Overbee—were responsible for training their subordinates. Rather, Plaintiff's allegations against the individuals are the same as her allegations against PHS, which is insufficient to establish the individual Defendants' liability. Plaintiff's failure-to-train claim against the individual PHS Defendants is therefore dismissed.

against a public official or municipal entity. Such a claim arises "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . ." *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Sheriff Scott argues that Plaintiff cannot raise a failure to train because she has no evidence of a history or a widespread practice of prior abuses that would have put the Sheriff on notice of a need for improved training. (Sheriff's Supp. Mem. at 21 (citing *Gold v. City of Miami,* 151 F.3d 1346 (11th Cir.1998)).)

But Plaintiff need not come forward with a pattern of abuses; "even a single earlier constitutional violation" may suffice to establish notice. *Am. Fed'n of Labor & Congress of Indus. Orgs. v. City of Miami,* 637 F.3d 1178, 1189 (11th Cir. 2011). Indeed, "[i]n some cases, the need for training is so obvious that deliberate indifference can be established even without an earlier violation of pattern of abuse" as long as it was "obvious that the municipality's failure to train or supervise its employees would result in a constitutional violation." *Id.*

Plaintiff's claim here is not necessarily that there was a pattern of conduct that should have put the Sheriff on notice— although she does put forward some evidence that restrained detainees were sprayed with pepper spray in the years before Christie's detention in 2009—but rather that the acknowledged repeated use of pepper spray should have put the Sheriff on notice that he needed to train corrections officers as to the proper use of pepper spray.

If the jury believes Plaintiff's evidence, it could find that the Sheriff knew or should have known that his deputies in the Jail were using pepper spray nearly indiscriminately to enforce the rules of the Jail. According to testimony, there were days in the Jail when all employees had to wear masks because the pepper spray was so thick in the air. That this overuse of pepper spray would result in injury or even, as happened here, death, is obvious. And given the admitted precarious mental state of many of the Jail's detainees, the overuse of pepper spray should have been expected to lead to mental breakdowns, as allegedly occurred here. Plaintiff has sufficient evidence from which a jury could conclude that the Sheriff violated § 1983 by failing to properly train his deputies in the appropriate use, and the dangers of overuse, of chemical agents. Summary judgment on this count is denied.

**2. Custom, Policy or Practice**

As noted, Plaintiff has two separate claims that the Sheriff promulgated or maintained unconstitutional policies, customs, or practices. Her first claim relates to policies about the use of force in the Jail, and her second claim relates to policies about ensuring adequate medical and mental health screening and care at the Jail. Plaintiff alleges both that some policies were facially unconstitutional and that some were facially constitutional but unconstitutionally applied, and also that the absence of policies in some instances led to the violation of Christie's constitutional rights.

Most of Plaintiff's claims, however, are that the Sheriff failed to have a policy in place and that failure led directly to the constitutional violation, not that a specific policy caused the violation. That a lack of policy might give rise to a violation of § 1983 seems logically correct—if the Sheriff knew that his deputies were doing something they should not have been doing but did not correct it, then the failure to correct the situation can certainly be a "custom" that violates § 1983. But neither party cites any cases on the standard

for such lack-of-policy situations. Both parties assume that the lack of a policy can violate § 1983 just as a formal policy can violate § 1983, and in the absence of authority to the contrary the Court will do the same.

a. *Policy regarding use of pepper spray on mentally ill detainees*

■ In March 2009, the Jail did not have a policy regarding the use of pepper spray on mentally ill detainees, despite the clear holding of *Thomas v. McNeil* several months earlier, that pepper spraying a detainee who is unable to conform his behavior in response to the pepper spraying violates the detainee's constitutional rights. The Jail had no mechanism to determine whether an inmate's mental health rendered him incapable of following a corrections officer's commands, and thus should not be pepper-sprayed for refusing to follow those commands. Rather, the Jail's policy was that inmates who yelled or banged on their cells were pepper-sprayed—spray first, ask questions later. And there is no dispute that the unit on which Christie was housed, unit 3A, was regarded by staff as the unit in which mentally ill inmates were held, so that staff knew or should have known that inmates in that unit were likely suffering from some sort of mental health issue.

Given *Thomas v. McNeil,* Plaintiff has raised a genuine issue of fact as to whether the Sheriff should have known that the failure to have a policy regarding pepper-spraying potentially mentally ill detainees would lead to the use of constitutionally excessive force against a detainee. Summary judgment on this point is denied.

b. *Policy regarding use of pepper spray for medically compromised detainees*

■ Plaintiff contends that the lack of a policy regarding the pepper-spraying of detainees with certain medical conditions led to the violation of Christie's constitutional rights. But the Jail is a pretrial detention center that does not and likely cannot know the health status of all detainees. Here, for example, after his second arrest, Christie refused to give any health information to the Jail. Although a perfect world would require no pepper spraying of any detainee with breathing or heart issues, the Jail's lack of policy regarding the use of pepper spray for detainees with potential medical problems stretches liability too far. How would such a policy be worded? Would it depend on whether the Jail knew of the health problems? Or whether the Jail should have known? If a detainee claims to have asthma, is that enough to preclude the use of pepper spray? The Jail does not have enough information about every detainee's medical history to make the formulation of a concrete policy possible. Plaintiff's challenge to this lack of policy is dismissed.

c. *Policy regarding number of times pepper spray could be used*

■ As with the pepper spraying of mentally ill detainees, the Jail had no policy about the number of times an inmate could be sprayed with pepper spray, despite widespread acknowledgment of the serious and painful effects pepper spray causes. As discussed in more detail in the next section, courts have expressed consternation when an inmate is sprayed every day of the week except one (resulting in second- and third-degree burns). *Thomas,* 614 F.3d at 1319 n. 30. Christie was sprayed 12 times in less than two days. Plaintiff has raised a question of fact as to whether the failure to have a policy regarding the number of times pepper spray could be used should have put the Sheriff on notice that a constitutional violation was likely to occur. Summary judgment is inappropriate on this claim.

d. *Policy regarding detainee restraint*

Plaintiff contends that the Jail had no policy prohibiting the use of pepper spray

against an individual in restraints, and this lack of policy should have put the Sheriff on notice that a detainee's constitutional rights would be violated.

" '[T]he policy and practice [of restraining an inmate] for a period of time that surpasses that necessary to quell a threat or restore order is a violation of the Eighth Amendment.' " [4] *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Hope v. Pelzer*, 240 F.3d 975, 980–81 (11th Cir.2001)). A punishment that is "totally without penological justification" violates the Eighth Amendment's prohibition on cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

■ Taking the facts in the light most favorable to Plaintiff, the absence of any policy regarding whether the use of pepper spray is appropriate on an individual who is fully restrained created an "obvious" constitutional violation. *See Hope*, 536 U.S. at 738, 122 S.Ct. 2508 ("[T]he Eighth Amendment violation is obvious" when prisoner was subdued then handcuffed to hitching post for seven hours.); *see also Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir.2005) ("[O]ne could draw a reasonable inference" that continued use of force after detainee was subdued or restrained "was for the very purpose of causing harm: excessive force."). Even assuming that Christie continued to yell or that he spat in the direction of an officer after he was restrained does not necessarily justify the pepper spraying that occurred. Rather, there is at least a question of fact as to whether there was any penological justification for the custom of allowing the use of pepper spray on restrained individuals, and thus Plaintiff's

challenge to the lack of policy/custom survives summary judgment.

#### e. *Policy regarding decontamination after pepper spray application*

■ Plaintiff challenges the Jail's lack of policy regarding immediate decontamination after pepper-spraying. The Sheriff's response is that there was water available in Christie's cell (and in other cells) and detainees were told they could use the water to decontaminate themselves. But if a detainee is in restraints, it is not possible for the detainee to decontaminate himself. Moreover, at some point, the abundance of pepper spray makes it difficult for a detainee to thoroughly decontaminate himself with a faucet in a sink—a shower is required. And whether Christie's mental health allowed him to understand the recommendation that he wash himself off is in serious dispute.

In one case, a detainee was sprayed once with pepper spray and left in his cell for 20 minutes. *Danley v. Allen*, 540 F.3d 1298, 1304 (11th Cir.2008), overruled on other grounds by *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). After twenty minutes, he was taken to a shower, but pepper spray still clung to him after the two-minute shower and his cellmates complained "that their eyes were burning because of the residue left on him." *Id.* The Eleventh Circuit found that this conduct rose to the level of a constitutional violation for which no qualified immunity was apparent, and moreover that the detainee had raised a genuine issue of fact regarding whether the jail's policy of "regularly den[ying] inmates prompt and adequate ventilation, decontamination, and medical care following pepper spray discharge" should have put the

---

4. Pretrial detainees are not covered by the 8th Amendment, but rather the 14th Amendment. The standards for deliberate indifference and excessive force claims are the same under either Amendment, however.

supervisors "on notice of misconduct that was sufficiently 'obvious, flagrant, rampant and of continued duration' to require [the supervisors] to act." *Id.* at 1315 (quoting *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990)).

The facts in *Danley* are far less egregious than the record here, taken in the light most favorable to Plaintiff, shows. Christie was sprayed 12 times in 36 hours, and was decontaminated only once. That no policy required more frequent decontamination was patently sufficient to put the Sheriff on notice that unconstitutional conduct either had or was likely to occur. Plaintiff's challenge to this policy survives summary judgment.

### 3. Assault and Battery

The Sheriff concedes that, if any of the Corrections Defendants is liable for assault and battery, he may be liable as well. Because, as discussed below, genuine issues of fact preclude summary judgment on Plaintiff's assault and battery claims against the Corrections Defendants, summary judgment is likewise inappropriate here.

### 4. Negligent Hiring, Retention, or Supervision

 Plaintiff raises two claims that the Sheriff is liable under state law for negligent hiring, retention, or supervision: first of the Corrections Defendants and second of PHS. The Sheriff does not respond to the claim regarding the hiring, retention, or supervision of PHS. Thus he apparently concedes that fact issues remain on this claim.

Plaintiff's claim regarding the Corrections Defendants is extremely general. She claims that the Sheriff should have known that each of the Corrections Defendants were unsuited to remain on the job "based on their record of violating inmates' and detainees' constitutional rights" (Pl.'s

Opp'n Mem. (Docket No. 218) at 40), but she does not elaborate as to what those "records" supposedly are. The only Corrections Defendant specifically called out for a history of violent conduct is Officer Calhoun, who not only admitted to physical altercations with detainees but also, shortly after Christie's death, allegedly asked the remaining detainees in Unit 3A, "Who else wants to die today?"

Plaintiff has failed to point to evidence in the record that establishes negligent hiring, retention, or supervision. There is no evidence of such pervasive misconduct by any of the Corrections Defendants that the Sheriff can be liable in tort for not terminating their employment. Thus, Count Nine of the 5th Amended Complaint is dismissed.

### C. Corrections Defendants

Plaintiff raises four claims against these individuals (all employees of the Lee County Sheriff's Office) who worked at the Jail as corrections officers: Deputy Daniel Falzone, Deputy Kurtis Calhoun, Deputy Dathan S. Pyle, Sgt. Armando Croker, Sgt. Mary DaRoss, and Sgt. Robert Bramblet. Two of Plaintiffs' claims are brought under § 1983: deliberate indifference to Christie's serious medical needs and excessive force. She also claims assault and battery, and raises a failure-to-supervise claim against Sergeants DaRoss, Bramblet, and Croker.

As with the nurse Defendants discussed above, each of these Defendants had different interactions with Christie during his second detention. Deputy Calhoun first sprayed Christie on the afternoon of March 27, 2009, within a minute or so of another spraying by an officer not a Defendant here, Monshay Gibbs. This was not the end of Calhoun's encounters with Christie, however. Officer Calhoun was on duty the morning of March 29, and he

not only sprayed and then "fogged"[5] Christie with pepper spray, but also sprayed Christie's cellmate, a Mr. Anderson, with pepper spray. These three pepper-spray incidents took place within a few hours of each other, and the nurses on duty testified that the pepper spray was so thick in Unit 3A that it caused them to choke and cough. At no time was any cell cleaned or any of the sprayed individuals decontaminated, so that the pepper spray remained where it had been sprayed. Christie was finally taken to the shower after the second time he was sprayed after being restrained, but that was his first real decontamination of the entire weekend.

Deputy Falzone fogged Christie at 8 am on March 29, immediately before Calhoun also fogged Christie. Deputy Pyle sprayed Christie at 9:45 am on March 29, after he had been strapped in the restraint chair. (Christie was sprayed again at 10:15 am; the record does not indicate who sprayed him on this occasion.) Sergeant Bramblet authorized another officer to spray Christie at 6 pm on March 28 because Christie was yelling; again the record does not establish who sprayed him at this time. Sergeant Croker also authorized a single pepper-spray application, but Plaintiff does not say when that application occurred.

Sergeant DaRoss was on duty on Sunday, March 29, and ordered that Christie be placed, naked, in the restraint chair. She also apparently authorized the placing of a spit mask on Christie's nose and mouth only a few minutes after one of the Deputies sprayed Christie in the face, and without any effort to decontaminate Christie. Canete testified that she told DaRoss that Christie was in some distress, but DaRoss allegedly did nothing in response.

### 1. Deliberate Indifference

■■■ A claim for deliberate indifference in the prison (or pretrial detention) context requires proof of three elements:

(1) that the defendant had subjective knowledge of a risk of serious harm;

(2) that the defendant disregarded that risk

(3) by conduct that is more than gross negligence.

*Thomas v. Bryant*, 614 F.3d 1288, 1312 (11th Cir.2010). "A prison official's deliberate indifference is a question of fact." *Id.*

■■■ Generally, although the use of pepper spray in a jail setting is not per se unconstitutional, "there are constitutional boundaries to its use." *Thomas*, 614 F.3d at 1310. The degree of pain pepper spray causes "is constitutional because the effects are temporary—or at least are intended to be." *Thomas*, 2009 WL 64616, at *22. "[E]ven where chemical agents are permissibly used, when the effects are longer lasting or exacerbated by prolonged exposure, inadequate decontamination, or poor ventilation ... the use of chemical agents may pose an unreasonable risk to an inmate's health that is serious enough to trigger inquiry under [the Constitution.]" *Id.* at *23.

■■■ In this case, viewing the facts in the light most favorable to Plaintiff, there is a genuine issue of fact as to whether some Corrections Defendants were deliberately indifferent to Christie's serious medical needs, both physical and mental. Generally, the Corrections Defendants had to be aware of the serious side effects

---

**5.** Fogging with pepper spray is apparently even worse than the direct spraying—it lasts longer and is a more concentrated formula, so it causes much more distress and pain than direct spraying.

multiple pepper-sprayings posed to even healthy inmates. At least one employee testified that on Sunday morning the air in the unit was so permeated with pepper spray that everyone in the unit was having difficulty breathing, "even the nurses." (Canete Dep. (Docket No. 187) at 61.) In the *Thomas* line of cases, the 11th Circuit noted with consternation that one of the plaintiffs had been pepper-sprayed 36 times in more than six years. Christie was exposed to pepper spray 12 times in 36 hours. The sheer volume of spraying in this case was surely "serious enough to trigger inquiry."

Moreover, the record shows that not only was Christie subjected to prolonged exposure to pepper spray, but he was never adequately decontaminated after being exposed to the pepper sprayings. And the unit's ventilation system was obviously not adequate to dissipate the amount of spraying, as evidenced by testimony regarding the need to wear masks on the unit because of the pepper spray in the air. (*See also* Winnie Dep. (Docket No. 208) at 35–36 (testifying that when she walked into the unit housing Christie on the morning of March 29, he was covered in spray, his cellmate was covered in spray, the walls, floor and beds were covered in spray, and she started to cough from the spray in the air).) The Corrections Defendants "turn[ed] a blind eye to [the] obvious danger" their overuse of pepper spray posed to Christie, and thus there is "ample support for the finding of the requisite recklessness" for a deliberate-indifference claim. *Thomas*, 614 F.3d at 1316.

■ Not all Corrections Defendants are equally culpable, however. The evidence does not establish that Sergeant Bramblet or Sergeant Croker knew that other officers were overusing pepper spray on Christie, and although Plaintiff attempts to show that these officers knew or should have known that Christie was men-

tally ill and that therefore the use of pepper spray was not appropriate, there is no evidence that either one of these individuals knew Christie's mental health status. Plaintiff has failed to establish that either Bramblet or Croker were deliberately indifferent and they are dismissed from this count.

### a. *Qualified Immunity*

[30] The remaining Corrections Defendants can avoid liability for the deliberate indifference claim if they can establish that they are entitled to qualified immunity. Qualified immunity does not, however, apply to protect them from liability for the excessive force claim, because excessive force requires a showing of maliciousness that is " 'so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution.' " *Skelly v. Okaloosa Cnty. Bd. of Cnty. Comm'rs*, 456 Fed.Appx. 845, 847 (11th Cir.2012) (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1321–22 (11th Cir.2002)).

■ "Qualified immunity protects [government] officials from § 1983 suits for civil damages arising from the discharge of their discretionary functions 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1273 (11th Cir.2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The purpose of qualified immunity "is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks and citations omitted).

To benefit from qualified immunity, the public official must first prove that he was acting pursuant to his discretionary authority. *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.2002). The burden then shifts to the plaintiff to establish that a constitutional violation occurred and that the constitutional right alleged was clearly established at the time of the violation. *Id.*

 There is no dispute that the Corrections Defendants were acting pursuant to their discretionary authority when they pepper-sprayed Christie. Thus, the question is whether a constitutional violation occurred and whether the constitutional right was clearly established. The Court need not consider these questions in a particular order. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). As discussed in more detail above, Plaintiff has offered sufficient evidence to establish genuine questions of fact as to whether Christie's constitutional rights were violated.

Nor is there much doubt that these rights were clearly established, or that the Corrections Defendants knew or should have known that their actions were contrary to the law. As Plaintiff points out, the *Thomas v. McNeil* pepper-spray case issued in January, more than three months before the incidents in question here. This case should have led the Corrections Defendants, at the very least, to question whether the repeated use of pepper spray complies with constitutional standards for the treatment of inmates. The Corrections Defendants are not entitled to qualified immunity on the record before the Court.

### 2. Excessive Force

 "The Due Process Clause of the Fourteenth Amendment protects pretrial detainees ... from the use of force that 'shocks the conscience,'" *Skelly*, 456 Fed. Appx. at 847. As the Supreme Court has framed it, the inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 130 S.Ct. 1175, 1178, 175 L.Ed.2d 995 (2010). The facts in *Skelly* are instructive: Skelly was arrested and handcuffed, but despite being compliant with the arresting officers' instructions, she was tased until she lost consciousness. *Id.* at 846. The officers' log showed that they continued to tase Skelly after she was unconscious. *Id.* at 847. The district court concluded that Skelly "had presented 'evidence from which a jury could infer a malicious and sadistic intent to apply force for the very purpose of causing harm.'" *Id.* (quoting unpublished opinion below).

 Here, the evidence in the light most favorable to Plaintiff shows that Christie was pepper-sprayed repeatedly, even after he was placed in a restraint chair. This is certainly evidence from which a jury could conclude that the Corrections Defendants were not attempting to maintain or restore discipline but rather were simply attempting to harm Christie. As above, however, there is no evidence that either Bramblet or Croker participated in or even ratified the conduct that constitutes excessive force in this case, and they will be dismissed from this count. Summary judgment is not appropriate as to the remaining Corrections Defendants, however.

### 3. Assault & Battery

 Plaintiffs' assault and battery claim is brought against Falzone, Calhoun, Pyle, and DaRoss only. The crux of a state-law assault and battery claim against the officers is "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee v.*

*Ferraro,* 284 F.3d 1188, 1197 (11th Cir. 2002). If the force used was "clearly excessive" and not "reasonable under the circumstances," *City of Miami v. Sanders,* 672 So.2d 46, 47 (Fla.Dist.Ct.App.1996), the Defendants may be liable for assault and battery under Florida law.

As discussed above, Plaintiff has established that there are genuine issues of fact as to whether these Corrections Defendants used excessive force against Christie. In other words, a reasonable factfinder could determine that the force used against Christie was "clearly excessive." Thus, as with the excessive force claim, the assault and battery claim survives summary judgment.

### 4. Failure to Supervise or Train

■ This claim is brought only against the Sergeants: Bramblet, Croker, and DaRoss. A supervisor may be liable under § 1983 "either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Keating v. City of Miami,* 598 F.3d 753, 762 (11th Cir.2010). Plaintiff has no specific evidence that any of these Defendants were responsible to train their subordinates, and her allegations against them in this regard are the same as her allegations against the Sheriff. These Defendants are not the proper Defendants for a failure-to-train claim.

■ A failure-to-supervise claim is more logical in this situation, but as to Bramblet and Croker, there is no evidence that they either "directed the[ir] subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* As to Sgt. DaRoss, however, the evidence is more ambiguous: she was present on March 29, she authorized putting Christie into restraints and was informed that the

officers continued to pepper-spray him after he was restrained. There is a genuine issue of fact as to whether there is a causal connection between her actions or inactions and the constitutional violations here. She is therefore not entitled to summary judgment.

### CONCLUSION

Many of Plaintiff's claims survive Defendants' Motions. Specifically, Plaintiff may pursue the following claims:

- § 1983 excessive force against Defendants Falzone, Calhoun, Pyle, and DaRoss (count 1);

- § 1983 deliberate indifference against PHS, Falzone, Calhoun, Pyle, DaRoss, Canete, Sundo, and Winnie (count 2);

- § 1983 failure to train/supervise against PHS, Sheriff Scott, and DaRoss (count 3);

- § 1983 custom, policy, or practice against PHS and Sheriff Scott (counts 4 and 5);

- medical negligence (count 7);

- assault and battery against Sheriff Scott, Falzone, Calhoun, Pyle, and DaRoss (count 8); and

- negligent hiring, retention, or supervision against Sheriff Scott and PHS (counts 10 and 11).

Accordingly, **IT IS HEREBY ORDERED that:**

1. The PHS Defendants' Motion for Summary Judgment (Docket No. 166) is **GRANTED** in part and **DENIED in part** as set forth above;

2. Sheriff Scott's Motion for Summary Judgment (Docket No. 167) is **GRANTED** in part and **DENIED in part** as set forth above; and

3. The Corrections Defendants' Motion for Summary Judgment (Docket No. 170)

is **GRANTED in part** and **DENIED in part** as set forth above.